The Honorable Mary Alice Theiler

_____ FILED _____ ENTERED
_____ LODGED _____ RECEIVED

IJUN 23 2011

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                      DEPUTY

## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. MJ11-292 |
| Plaintiff, | AMENDED COMPLAINT |
| v. | FOR VIOLATIONS |
| ABU KHALID ABDUL-LATIF,<br>    a/k/a JOSEPH ANTHONY DAVIS, and | |
| WALLI MUJAHIDH,<br>    a/k/a FREDERICK DOMINGUE, JR., | |
| Defendants. | |

BEFORE, MARY ALICE THEILER, United States Magistrate Judge,
United States Courthouse, 700 Stewart Street, Seattle, Washington

## COUNT 1

### (Conspiracy to Murder Officers and Employees of the United States)

Beginning at a time unknown, and continuing until on or about June 22, 2011, at

Seattle, within the Western District of Washington, and elsewhere, ABU KHALID

ABDUL-LATIF, a/k/a JOSEPH ANTHONY DAVIS, and WALLI MUJAHIDH, a/k/a

FREDERICK DOMINGUE, JR., and other persons known and unknown, knowingly and

intentionally did conspire to kill officers and employees of the United States and of an

agency of the United States Government, while such officers and employees were

engaged in, and on account of the performance of, their official duties, and to kill other

COMPLAINT
*United States v. Abdul-Latif, et al.* - 1

1 persons assisting such officers and employees in the performance of such duties and on

2 account of that assistance.

3 **A.    Background Allegations**

4      At all times material to this Complaint:

5      1.    The Department of Defense operates numerous Military Entrance

6 Processing Stations ("MEPS") throughout the United States.  Applicants seeking to join

7 one of the branches of the United States Military, including the Army, Navy, Air Force,

8 and Marines, apply through and are processed at a MEPS.  Accepted applicants often go

9 through final processing at a MEPS and then are transported to basic training directly

10 from the MEPS.

11      2.    A MEPS is staffed by United States Military personnel and other federal

12 civilian employees, who administer tests and evaluate an applicant's physical

13 qualifications and other aptitude per criteria set by each branch of the United States

14 Military.  MEPS employees also process applicants for acceptance into the United States

15 Military.

16      3.    One of the Department of Defense MEPS is housed in the Federal Center

17 South building, located at 4735 East Marginal Way, Seattle, Washington.  The Federal

18 Center South building is owned and operated by the United States Government, General

19 Services Administration.  In addition to the MEPS, this building houses a variety of other

20 United States Government agencies and offices.

21 **B.    Object of the Conspiracy**

22      4.    The object of the conspiracy was to kill officers and employees of the

23 Department of Defense who worked at the MEPS located in the Federal Center South

24 building in Seattle, Washington, and to kill other persons assisting such officers and

25 employees in the performance of their duties, including the security personnel at the

26 Federal Center South building.

27 //

28 //

COMPLAINT
*United States v. Abdul-Latif, et al.* - 2

## C.     Overt Acts in Furtherance of the Conspiracy

5.     During and in furtherance of the conspiracy, within the Western District of Washington and elsewhere, one or more of the conspirators committed one or more of the following overt acts, among others:

a.     On or about May 30, 2011, ABU KHALID ABDUL-LATIF attempted to recruit another person (hereinafter the "confidential source") to join the conspiracy, explaining that he and another man who lived in Los Angeles, California, referring to WALLI MUJAHIDH, were planning an attack against a United States Military facility.

b.     On or about June 6, 2011, ABU KHALID ABDUL-LATIF spoke with WALLI MUJAHIDH over the telephone in the presence of the confidential source. They discussed the general nature of the conspiracy, including the need to acquire firearms for use in the attack, and their plan to train with the firearms in advance of the attack. During this conversation, MUJAHIDH assured ABDUL-LATIF that he was committed to carrying out the attack.

c.     On or about June 7, 2011, ABU KHALID ABDUL-LATIF told the confidential source that he wanted to conduct reconnaissance of the MEPS on the following day, and then "make a plan from there."

d.     On or about June 8, 2011, ABU KHALID ABDUL-LATIF met with the confidential source for the purpose of conducting reconnaissance of the MEPS located in the Federal Center South building in Seattle, Washington. ABDUL-LATIF and the confidential source drove to the building, parked in the parking lot, and approached the front door of the building. ABDUL-LATIF commented on the presence of a security guard inside the lobby of the building, and the security cameras on the exterior of the building. ABDUL-LATIF further stated that he was not "worried" about the security guard because, "We'll just kill him right away. . . . We can kill him first."

//

//

COMPLAINT
*United States v. Abdul-Latif, et al. - 3*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1          e.     On or about June 8, 2011, ABU KHALID ABDUL-LATIF

2  instructed the confidential source to acquire weapons for use during the attack of the

3  MEPS, including firearms, magazines, ammunition, and grenades.

4          f.     On or about June 14, 2011, ABU KHALID ABDUL-LATIF spoke

5  with WALLI MUJAHIDH over the telephone in the presence of the confidential source.

6  They arranged for MUJAHIDH to travel via bus from Los Angeles, California, to Seattle,

7  Washington, on June 20-21, 2011.

8          g.     On or about June 14, 2011, ABU KHALID ABDUL-LATIF met

9  with the confidential source and inspected representative samples of the weapons

10  (including machineguns and grenades) that ABDUL-LATIF instructed the confidential

11  source to obtain for their use during the attack on the MEPS.  After inspecting the

12  weapons, ABDUL-LATIF instructed the confidential source to obtain three machineguns

13  and several loaded magazines for the machineguns, with the understanding that they

14  would obtain grenades and other items necessary for the attack at a later time.

15          h.     On or about June 16-17, 2011, ABU KHALID ABDUL-LATIF

16  provided the confidential source with $800 cash to pay for the weapons that he and

17  WALLI MUJAHIDH intended to use during the attack on the MEPS.

18          i.     On or about June 20-21, 2011, WALLI MUJAHIDH traveled via bus

19  from Los Angeles, California, to Seattle, Washington.

20          j.     On or about June 21, 2011, ABU KHALID ABDUL-LATIF and

21  WALLI MUJAHIDH met with the confidential source and further discussed the details of

22  their planned attack on the MEPS, including that they intended to use machineguns and

23  grenades during the attack.

24          k.     On or about June 22, 2011, ABU KHALID ABDUL-LATIF and

25  WALLI MUJAHIDH met with the confidential source to take possession of the

26  machineguns that ABDUL-LATIF previously instructed the Source to acquire.

27        All in violation of Title 18, United States Code, Sections 1114(1) and 1117.

28

COMPLAINT
*United States v. Abdul-Latif, et al. - 4*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## COUNT 2

### (Conspiracy to Use Weapons of Mass Destruction)

Beginning at a time unknown, and continuing until on or about June 22, 2011, at Seattle, within the Western District of Washington, and elsewhere, ABU KHALID ABDUL-LATIF, a/k/a JOSEPH ANTHONY DAVIS, and WALLI MUJAHIDH, a/k/a FREDERICK DOMINGUE, JR., and other persons known and unknown, knowingly and intentionally, and without legal authority, did conspire to use a weapon of mass destruction, that is, a destructive device consisting of a grenade, against property that is owned and used by the United States and by a department and agency of the United States, namely, the Federal Center South building, located at 4735 East Marginal Way, Seattle, Washington; and against persons and property within the United States, where a perpetrator traveled in and caused another to travel in interstate commerce in furtherance of the offense.

The allegations contained in paragraphs 1-5 of Count 1 above are herein re-alleged and incorporated by reference.

All in violation of Title 18, United States Code, Sections 2332a(a)(2)(C) and 2332a(a)(3).

## COUNT 3

### (Possession of Firearms in Furtherance of Crimes of Violence)

On or about June 14, 2011, ABU KHALID ABDUL-LATIF, a/k/a JOSEPH ANTHONY DAVIS, possessed firearms, to wit, one Heckler & Koch MP5, 9 x 19 mm caliber sub-machinegun, with serial number 62-370875, and one Colt M16A2 Commando, 5.56 mm caliber assault rifle, with serial number A0137282, in furtherance of a crime of violence for which he may be prosecuted in a court of the United States, that is, the offenses alleged in Count 1 and Count 2 above.

//

//

//

COMPLAINT
*United States v. Abdul-Latif, et al. - 5*

1   It is further alleged that both of the firearms possessed by ABDUL-LATIF were

2   machineguns, as defined in Title 18, United States Code, Section 921(a)(23), and Title 26,

3   United States Code, Section 5845(b).

4   All in violation of Title 18, United States Code, Sections 924(c)(1)(A) and

5   924(c)(1)(B)(ii).

6   **COUNT 4**

7   **(Unlawful Possession of Firearms)**

8   On or about June 14, 2011, at Seattle, within the Western District of Washington,

9   ABU KHALID ABDUL-LATIF, a/k/a JOSEPH ANTHONY DAVIS, having been

10   convicted of a crime punishable by imprisonment for a term exceeding one year, that is,

11   Robbery in the First Degree, in Kitsap County Superior Court, Case No. 01-1-01719-3, on

12   January 15, 2002, did knowingly possess firearms, to wit, one Heckler & Koch MP5, 9 x

13   19 mm caliber sub-machinegun, with serial number 62-370875, and one Colt M16A2

14   Commando, 5.56 mm caliber assault rifle, with serial number A0137282, both of which

15   had previously been shipped and transported in interstate or foreign commerce.

16   All in violation of Title 18, United States Code, Section 922(g)(1).

17   **COUNT 5**

18   **(Possession of Firearms in Furtherance of Crimes of Violence)**

19   On or about June 22, 2011, ABU KHALID ABDUL-LATIF, a/k/a JOSEPH

20   ANTHONY DAVIS, possessed firearms, to wit, a Colt M16A1, 5.56 mm caliber assault

21   rifle, with serial number 9463259; a Colt M16A1, 5.56 mm caliber assault rifle, with

22   serial number 9574856; and a Colt M16A1, 5.56 mm caliber assault rifle, with serial

23   number 9396093; in furtherance of a crime of violence for which he may be prosecuted in

24   a court of the United States, that is, the offenses alleged in Count 1 and Count 2 above.

25   It is further alleged that each of the firearms possessed by ABDUL-LATIF were

26   machineguns, as defined in Title 18, United States Code, Section 921(a)(23), and Title 26,

27   United States Code, Section 5845(b).

28   All in violation of Title 18, United States Code, Sections 924(c)(1)(A) and

COMPLAINT
*United States v. Abdul-Latif, et al.* - 6

1  924(c)(1)(B)(ii).

2                              **COUNT 6**

3              **(Possession of Firearms in Furtherance of Crimes of Violence)**

4          On or about June 22, 2011, WALLI MUJAHIDH, a/k/a FREDERICK

5  DOMINGUE, JR., possessed firearms, to wit, a Colt M16A1, 5.56 mm caliber assault

6  rifle, with serial number 9463259; a Colt M16A1, 5.56 mm caliber assault rifle, with

7  serial number 9574856; and a Colt M16A1, 5.56 mm caliber assault rifle, with serial

8  number 9396093; in furtherance of a crime of violence for which he may be prosecuted in

9  a court of the United States, that is, the offenses alleged in Count 1 and Count 2 above.

10         It is further alleged that each of the firearms possessed by MUJAHIDH were

11  machineguns, as defined in Title 18, United States Code, Section 921(a)(23), and Title 26,

12  United States Code, Section 5845(b).

13         All in violation of Title 18, United States Code, Sections 924(c)(1)(A) and

14  924(c)(1)(B)(ii).

15                             **COUNT 7**

16                  **(Unlawful Possession of Firearms)**

17         On or about June 22, 2011, at Seattle, within the Western District of Washington,

18  ABU KHALID ABDUL-LATIF, a/k/a JOSEPH ANTHONY DAVIS, having been

19  convicted of a crime punishable by imprisonment for a term exceeding one year, that is,

20  Robbery in the First Degree, in Kitsap County Superior Court, Case No. 01-1-01719-3, on

21  January 15, 2002, did knowingly possess firearms, to wit, a Colt M16A1, 5.56 mm caliber

22  assault rifle, with serial number 9463259; a Colt M16A1, 5.56 mm caliber assault rifle,

23  with serial number 9574856; and a Colt M16A1, 5.56 mm caliber assault rifle, with serial

24  number 9396093; each of which had previously been shipped and transported in interstate

25  or foreign commerce.

26         All in violation of Title 18, United States Code, Section 922(g)(1).

27         The undersigned complainant, ALBERT C. KELLY III, being duly sworn, states

28  that this Complaint is based on the following information:

COMPLAINT
*United States v. Abdul-Latif, et al. - 7*

## A.    Introduction And Agent's Background

1.      I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI"). I have been an FBI SA since March 2008, and since that time I have been assigned to a counter-terrorism squad at the Seattle Division. I graduated from the Air Force Academy in 2002. I served as an Air Force Intelligence Officer in both Afghanistan and Djibouti. In March 2008, I went through the standard FBI training regimen at Quantico, Virginia. In addition, I have attended the FBI's specialized counter-terrorism investigative operations course, and another training course concerning terrorist ideology.

2.      This affidavit is being submitted in support of a criminal Complaint charging ABU KHALID ABDUL-LATIF, a/k/a JOSEPH ANTHONY DAVIS (hereinafter "ABDUL-LATIF"), and WALLI MUJAHIDH, a/k/a FREDERICK ANTHONY DOMINGUE, JR. (hereinafter "MUJAHIDH"), with the following offenses: Conspiracy to Murder Officers and Employees of the United States, in violation of Title 18, United States Code, Sections 1114(1) and 1117; Conspiracy to Use Weapons of Mass Destruction, in violation of Title 18, United States Code, Sections 2332a(a)(2)(C) and 2332a(a)(3); Possession of Firearms (Machineguns) in Furtherance of Crimes of Violence, in violation of Title 18, United States Code, Sections 924(c)(1)(A) and 924(c)(1)(B)(ii); and Unlawful Possession of Firearms, in violation of Title 18, United States Code, Section 922(g)(1). This affidavit is based upon information I have gained from my investigation, personal observations, training and experience, and information related to me by other detectives, investigators, and police officers, through oral and written reports. I have not included everything I have learned during this investigation, but rather only enough information to show probable cause that the defendants have committed the offenses alleged above.

## B.    Summary Of The Investigation

3.      This investigation has revealed that ABDUL-LATIF and MUJAHIDH (collectively, "the defendants") conspired to attack a United States Military facility and to

COMPLAINT
*United States v. Abdul-Latif, et al.* - 8

1   murder employees and officers of the United States Military.  The defendants planned to

2   carry out the attack using fully-automatic weapons, pistols, and fragmentation grenades.

3   Their goal was to kill and maim numerous officers and employees of the United States

4   Military.  During conversations that were audio recorded, ABDUL-LATIF explained the

5   reasons for the attack, specifically his anger over the United States Military's real or

6   perceived activities in Afghanistan, Iraq, and Yemen.  ABDUL-LATIF explained that, in

7   his view, murdering American soldiers was justifiable.

8           4.      The defendants' initial target for their attack was the Joint Base Lewis-

9   McChord, a joint facility consisting of a United States Army base (previously known as

10  "Fort Lewis") and a United States Air Force base (previously known as "McChord Air

11  Force Base").  The defendants later changed their target to the Military Entrance

12  Processing Station ("MEPS") located at 4735 East Marginal Way, Seattle, Washington.

13          5.      The Department of Defense operates numerous MEPS throughout the

14  United States.  Applicants seeking to join one of the branches of the United States

15  Military, including the Army, Navy, Air Force, and Marines, apply through and are

16  processed at a MEPS.  Accepted applicants often go through final processing at a MEPS

17  and then are transported to basic training directly from the MEPS.  A MEPS is staffed by

18  United States Military personnel and other federal civilian employees, who administer

19  tests and evaluate an applicant's physical qualifications and other aptitude per criteria set

20  by each branch of the United States Military.  MEPS employees also process applicants

21  for acceptance into the United States Military.

22          6.      One of the Department of Defense MEPS is housed in the Federal Center

23  South building, located at 4735 East Marginal Way, Seattle, Washington.  The Federal

24  Center South is a two-story building that is owned and operated by the United States

25  Government, General Services Administration.  In addition to the MEPS, this building

26  houses a variety of other United States Government agencies and offices.  A federal child

27  care center is located in the building, immediately adjacent to the MEPS.

28

COMPLAINT
*United States v. Abdul-Latif, et al.* - 9

7.     The plot was revealed when ABDUL-LATIF recruited a third person to join the conspiracy.  That person reported the plot to law enforcement and is now a law enforcement confidential source (the "Source").  Per standard practice, I will refer to the Source as a man, regardless of the Source's actual gender.  Based on their prior relationship, ABDUL-LATIF trusted the Source and believed that the Source held similar ideology.  ABDUL-LATIF also believed that the Source could help the conspirators get the weapons they would need for the attack.

8.     On numerous occasions during the investigation, the Source communicated with the defendants at the direction of law enforcement personnel.  Numerous meetings and conversations between the Source and the defendants were recorded on audio and/or video.  These recordings show the defendants working to carry out their plan to kill officers and employees of the United States Military.  Some (but certainly not all) examples of the defendants' intent, planning, preparation, and overt acts are listed below and are described in greater detail elsewhere herein:

        a.     After conducting internet research and reconnaissance, the defendants selected the Seattle MEPS as a target;

        b.     ABDUL-LATIF tasked the Source to go "undercover" into the Federal Center South building to learn the layout of the building and the specific location of the MEPS, and the Source reported back to ABDUL-LATIF after supposedly doing this;

        c.     ABDUL-LATIF devised and extensively discussed the tactical details of the attack;

        d.     ABDUL-LATIF instructed the Source to obtain automatic weapons, pistols, grenades, bulletproof vests, and other items for use in the attack on the MEPS;

        e.     ABDUL-LATIF personally handled two types of automatic weapons as part of the process of choosing the weapons to use during the attack, and he tasked the Source to buy three machineguns and several loaded magazines, with the understanding that grenades and other items necessary for the attack would be obtained at a later time;

COMPLAINT
*United States v. Abdul-Latif, et al.* - 10

1         f.     ABDUL-LATIF provided the Source with $800 cash towards the

2 purchase of the machineguns;

3         g.     ABDUL-LATIF arranged to purchase a bus ticket for MUJAHIDH

4 to travel from Los Angles, California to Seattle, Washington.

5         h.     On June 20-21, 2011, MUJAHIDH traveled to Seattle, Washington

6 to participate in the attack;

7         i.     On or about June 21, 2011, ABDUL-LATIF and WALLI

8 MUJAHIDH met with the confidential source and further discussed the details of the

9 planned attack on the MEPS, including that they intended to use machineguns and

10 grenades during the attack.

11         j.     On or about June 22, 2011, ABDUL-LATIF and MUJAHIDH met

12 with the confidential source to take possession of the three machineguns and magazines

13 that ABDUL-LATIF previously instructed the Source to acquire.

14     9.     The investigation culminated with the arrest of ABDUL-LATIF and

15 MUJAHIDH on June 22, 2011, as detailed below.

16 **B.    Defendants' Backgrounds**

17     10.    ABDUL-LATIF is a thirty-three year old Washington resident.  Criminal

18 records checks show that he has at least two felony convictions: a 2002 conviction for

19 Robbery in the First Degree and a 2003 conviction for Custodial Assault.  ABDUL-

20 LATIF also has misdemeanor convictions for Obstructing a Law Enforcement Officer,

21 Assault, and Theft.  I have seen the Judgement and Sentence for ABDUL-LATIF's 2002

22 Robbery conviction, and it shows that he was convicted on or about January 15, 2002, in

23 the Kitsap County Superior Court, for the offense of Robbery in the First Degree, in

24 violation of RCW 9A.56.200, cause number 01-1-01719-3.  This is a felony offense and

25 ABDUL-LATIF was sentenced to thirty-one months of imprisonment.  The paperwork

26 from that case includes a psychological evaluation.  The evaluator concluded that,

27 although ABDUL-LATIF might have some psychological issues, he was competent to

28 participate in his defense.  Criminal records checks show no felony convictions for

COMPLAINT
*United States v. Abdul-Latif, et al.* - 11

1    California resident MUJAHIDH under either of his names.

2    **C.    Details Of The Investigation**

3    <u>The Source Reports The Conspiracy To Law Enforcement</u>

4    11.    This investigation began on June 3, 2011, when the Source contacted the

5    Seattle Police Department ("SPD") to report the conspiracy. The Source has known

6    ABDUL-LATIF personally for several years. When the Source initially contacted the

7    SPD, he was not working as an informant for any law enforcement agency. The Source

8    has since become a paid informant. The Source has extensive criminal history, including

9    at least five felony convictions and one misdemeanor conviction. The most recent

10   conviction that I know of was in 2008. Although the Source has been convicted of

11   extremely serious offenses, the Source has no convictions for crimes of dishonesty.

12   Criminal history records also shows multiple names and two social security numbers for

13   the Source. To the best of my knowledge and based on my investigation, the Source does

14   not have any pending criminal charges.

15   12.    On June 4, 2011, the Source met with SPD detectives and provided

16   additional details concerning his recent contacts with ABDUL-LATIF. The Source said

17   that he had met with ABDUL-LATIF on or about May 30, 2011, at ABDUL-LATIF's

18   home in Tukwila, Washington. According to the Source, during this meeting ABDUL-

19   LATIF told the Source that he and another man from Los Angeles (referring to

20   MUJAHIDH) were planning to attack Joint Base Lewis-McChord ("Fort Lewis") in

21   Tacoma, Washington. ABDUL-LATIF told the Source that the attack would be in

22   retaliation for alleged crimes committed by United States soldiers in Afghanistan.

23   ABDUL-LATIF said that he wanted to die as a martyr in the attack. According to the

24   Source, ABDUL-LATIF asked the Source to join the conspiracy. ABDUL-LATIF asked

25   the Source to participate directly in the attack, and to help the conspirators acquire

26   weapons. According to the Source (and as corroborated by later recorded conversations),

27   ABDUL-LATIF claims to know very little about firearms, and believes that the Source

28   has connections who can supply firearms. The Source pretended to be interested in the

COMPLAINT
*United States v. Abdul-Latif, et al.* - 12

1   plan. The May 30th meeting was not recorded because the Source was not working for

2   law enforcement at that time.

3        13.    Acting on instructions from the SPD, the Source met with ABDUL-LATIF

4   on June 3, 2011. According to the Source's account of this meeting, the Source told

5   ABDUL-LATIF that he had a contact who could supply weapons. ABDUL-LATIF said

6   that he had between $800 and $1,200 to buy weapons, and asked how much money the

7   Source could contribute. The Source said he could contribute $1,000. ABDUL-LATIF

8   told the Source that a man from Los Angeles, named "Walli," would also participate in

9   the attack. "Walli" was later identified as WALLI MUJAHIDH. ABDUL-LATIF said

10  that MUJAHIDH would be the driver for the attack. ABDUL-LATIF explained that he

11  wanted to drive a van through the Fort Lewis guard gate and open fire with weapons and

12  possibly explosives. ABDUL-LATIF made clear that the goal was to kill soldiers, not

13  civilians.

14       14.    According to the Source, during the June 3rd meeting, ABDUL-LATIF

15  introduced the Source to MUJAHIDH by calling MUJAHIDH on the telephone and

16  having him talk to the Source. MUJAHIDH told the Source that his phone number was

17  323-667-8960. My investigation has shown that the subscriber for this phone number is

18  "Muslim Mujahidh," and the account is in the name of WALLI MUJAHIDH. The Source

19  told MUJAHIDH that he had a contact who could supply weapons.

20       15.    After the phone call with MUJAHIDH, ABDUL-LATIF told the Source

21  that he wanted to conduct the attack as soon as possible, and before the conspirators could

22  talk themselves out of it. According to the Source, ABDUL-LATIF specifically

23  commented with words to the effect that, "The longer we wait, the more we'll talk

24  ourselves out of it." ABDUL-LATIF also stated that the longer they waited, the "more

25  chance the feds will catch-up with you." ABDUL-LATIF told the Source that he wanted

26  to acquire, for use in the attack, AK-47 assault rifles, a rocket propelled grenade ("RPG"),

27  grenades, and bullet proof vests. ABDUL-LATIF explained that, in advance of the

28  attack, the conspirators would train with the weapons in Wenatchee, Washington.

COMPLAINT
*United States v. Abdul-Latif, et al.* - 13

16.    According to the Source, ABDUL-LATIF explained his motives. ABDUL-LATIF said that he admired Osama Bin Laden. ABDUL-LATIF said that "jihad" in America should be a "physical jihad," and not just a "media jihad," expressing his view that it was necessary to take action rather than just talk. ABDUL-LATIF referred to the 2009 Fort Hood massacre, when a single gunman killed thirteen people. ABDUL-LATIF said that if one person could kill so many people, three attackers could kill many more. ABDUL-LATIF said that, if he was killed in the attack, his son would be proud that he fought the "non-believers."

17.    On June 6, 2011, the Source met with me and other FBI Special Agents. From that point on, the Source has been acting at the FBI's direction. We told the Source that he should purport to agree to join ABDUL-LATIF's conspiracy and record all of his future conversations with ABDUL-LATIF and MUJAHIDH.

### The Plot Focuses On The MEPS

18.    Later on June 6, 2011, the Source met with ABDUL-LATIF at ABDUL-LATIF's home in Tukwila. This was the first time that the Source met with ABDUL-LATIF at the FBI's direction. We gave the Source a recording device before the meeting. I have listened to the recording of that meeting. During the meeting, ABDUL-LATIF talked about alleged atrocities committed by United States soldiers in Afghanistan, specifically referencing ongoing military proceedings against Army soldiers stationed at Fort Lewis. ABDUL-LATIF said that he was not comfortable with letting the legal system deal with these matters.

19.    ABDUL-LATIF and the Source then discussed ABDUL-LATIF's plan to attack Fort Lewis. ABDUL-LATIF said that they could simply drive a truck through the base's gate. ABDUL-LATIF and the Source talked about what kinds of weapons they would need. Based on ABDUL-LATIF's prior statements that he wanted to perpetrate the attack with AK-47 assault rifles, the Source suggested the alternative of M16 assault rifles, which are consistent with the capabilities of an AK-47 but are more readily available in the United States. The Source explained that he would be able to obtain three

COMPLAINT
*United States v. Abdul-Latif, et al.* - 14

1   automatic M16's for $1,200. ABDUL-LATIF said that he trusted the Source's opinions

2   about weapons because the Source had experience with firearms. The Source said that, if

3   ABDUL-LATIF came up with the plan, the Source could handle the tactical aspects of

4   the operation. ABDUL-LATIF suggested committing the attack on July 5, 2011.

5       20.    ABDUL-LATIF and the Source then had a phone conversation with

6   MUJAHIDH. MUJAHIDH is believed to have been in Los Angeles, California (where

7   he lives) at the time of the call. The Source asked ABDUL-LATIF what type of firearms

8   he wanted. ABDUL-LATIF used his computer to look-up the M16 assault rifle on the

9   Internet. ABDUL-LATIF stated, "I want the one . . . that will have the most effect."

10  ABDUL-LATIF asked MUJAHIDH for his input. MUJAHIDH said that, if the

11  conspirators had enough ammunition, they "should be able to take care of that." The

12  defendants and the Source discussed flying MUJAHIDH from Los Angeles to Seattle

13  during the next couple of weeks.

14      21.    During the phone conversation, the Source said that he wanted to be sure

15  that MUJAHIDH was committed to the plan and would not "back out." MUJAHIDH

16  answered, "You don't have to worry about me." ABDUL-LATIF also asked

17  MUJAHIDH if he was committed. MUJAHIDH answered that he had "nothing to lose"

18  and "everything to gain."

19      22.    ABDUL-LATIF then explained that the conspirators should pick a leader.

20  The Source nominated ABDUL-LATIF based on his age and knowledge of Islam.

21  MUJAHIDH agreed. ABDUL-LATIF then told MUJAHIDH that they would bring him

22  up to Washington and go "camping" and practice their "skills." In an apparent reference

23  to weapons training, MUJAHIDH said that he had no "experience." The Source then

24  suggested that their respective roles would be "emir" (or leader), "tactician," and

25  "driver." ABDUL-LATIF told MUJAHIDH that his role would be to drive a "truck that

26  looks like the Titanic" through the "front gate" of the target location. The truck would be

27  a "battering ram" and would "guard" the conspirators while they did their "duties" (the

28  attack). ABDUL-LATIF said that he and the Source needed a driver while they did their

COMPLAINT
*United States v. Abdul-Latif, et al.* - 15

1  "part." ABDUL-LATIF explained that at some point during the attack, MUJAHIDH

2  would join the Source and ABDUL-LATIF as they carried out their responsibilities.

3  ABDUL-LATIF said that he was looking for a "psychopath." The phone call with

4  MUJAHIDH ended shortly thereafter.

5        23.    ABDUL-LATIF and the source then continued discussing the attack plan.

6  They began researching Fort Lewis on the Internet. ABDUL-LATIF stated that he

7  wanted to find the spot on the base "where the most activity is at." The Source asked

8  ABDUL-LATIF what the "objective" was. ABDUL-LATIF said that the "objective" was

9  to "take out anybody wearing green or a badge."

10        24.    During this conversation, ABDUL-LATIF suggested a new target: "hitting"

11  a "MEPS." The Source asked what a MEPS was. ABDUL-LATIF (who served briefly in

12  United States Navy in the mid-1990's) explained that a MEPS was a military processing

13  station where applicants are tested and evaluated. ABDUL-LATIF said that the

14  applicants at a MEPS were people who want to go to Iraq or Afghanistan. ABDUL-

15  LATIF explained the tactical advantages of attacking a MEPS, where many potential

16  victims would be unarmed: "It's a confined space, not a lot of people carrying weapons,

17  and we'd have an advantage."

18        25.    ABDUL-LATIF and the Source then researched on the Internet and found a

19  military recruiting office in downtown Seattle. ABDUL-LATIF said that attacking a

20  MEPS might "deter" people from joining the military and would "send a message."

21  ABDUL-LATIF also noted that there would be few, if any, civilians at a MEPS.

22  ABDUL-LATIF said that, although he was the "emir," he wanted the Source's thoughts

23  on whether the MEPS was a good target. The Source answered that he thought the MEPS

24  was a viable target. ABDUL-LATIF said that they could walk in and "hit" anybody in the

25  MEPS. ABDUL-LATIF suggested that they should drive over to the building and "take a

26  look."

27        26.    Earlier on June 6th, the Source sent a text message to MUJAHIDH's cell

28  phone number. The Source asked MUJAHIDH for his true name so that he could arrange

COMPLAINT
*United States v. Abdul-Latif, et al.* - 16

1 | to purchase a plane ticket for MUJAHIDH's flight from Los Angeles to Seattle.

2 | MUJAHIDH answered that his name was FREDERICK ANTHONY DOMINGUE, JR. I

3 | have reviewed this exchange of text messages.

4 |      27.     ABDUL-LATIF and the Source met again the next day, June 7, 2011. This

5 | meeting was also recorded, and I have listened to the recording. Almost as soon as the

6 | conversation began, ABDUL-LATIF told the Source that the military recruiting office in

7 | downtown Seattle was not the MEPS he wanted to attack: "That building we saw [on the

8 | Internet] downtown, that's, that's not it." ABDUL-LATIF said that the target MEPS was

9 | located on East Marginal Way near Boeing Field (referring to the Federal Center South

10 | building). ABDUL-LATIF said that he had looked-up the MEPS (apparently on the

11 | Internet) but that he could not see it well from aerial views.

12 |      28.     ABDUL-LATIF told the Source: "We need to get inside that building. . . .

13 | The idea I had was for you to kind of go undercover. . . . Go in there and see what the

14 | first floor looks like." ABDUL-LATIF again explained what a MEPS was, and added

15 | that most applicants would be sent to Afghanistan, Iraq, and Yemen. ABDUL-LATIF

16 | said that he called the MEPS to confirm the address of the East Marginal Way location.

17 | ABDUL-LATIF further stated that he and the Source should meet the next day to drive by

18 | the building: "We need to know what the front desk looks like, the lobby, everything."

19 | ABDUL-LATIF said that they could then draw a map of the layout of the first floor.

20 | ABDUL-LATIF and the Source then researched the target MEPS on the Internet.

21 | ABDUL-LATIF opined that the target MEPS was better than the downtown location

22 | because it was two stories as opposed to five.

23 |      29.     ABDUL-LATIF further discussed his planned attack on the MEPS.

24 | ABDUL-LATIF said that he had "never heard of a terrorist attack on a MEPS station."

25 | ABDUL-LATIF said that the military was "arrogant" and stated that their attack could

26 | "do some damage." ABDUL-LATIF also predicted that the attack would inspire other

27 | Muslims to carry out similar attacks: "Imagine how many young Muslims, if we're

28 | successful, will try to hit these kinds of centers. Imagine how fearful America will be,

COMPLAINT
*United States v. Abdul-Latif, et al.* - 17

1  and they'll know they can't push the Muslims around." ABDUL-LATIF also mentioned

2  the possibility that the conspirators could escape after perpetrating the attack.

3       30.    During the conversation, ABDUL-LATIF and the Source revisited the

4  question of who should lead the conspirators. ABDUL-LATIF, after learning that the

5  Source was older than ABDUL-LATIF, said that the Source should be the leader. The

6  Source disagreed, noting that ABDUL-LATIF had more "knowledge."

7       31.    ABDUL-LATIF told the Source that they should drive by the target MEPS

8  the next day, get the layout, and "make a plan from there."

9       The Reconnaissance Of The MEPS

10      32.    On the following day, June 8, 2011, ABDUL-LATIF and the Source

11 conducted reconnaissance of the target MEPS. ABDUL-LATIF and the Source met at a

12 different location and then drove together in the Source's vehicle to the MEPS on East

13 Marginal Way. I have listened to the recording of this meeting, which was also

14 monitored by surveillance officers.

15      33.    During the drive to the MEPS, ABDUL-LATIF assured the Source that

16 MUJAHIDH would participate in the attack, but added that MUJAHIDH needed

17 "medication." ABDUL-LATIF said that MUJAHIDH was worried that, if he did not

18 have his medication, he might "go off and kill innocent people." ABDUL-LATIF said

19 that he told MUJAHIDH that the target was "military," not a public place "like a zoo or a

20 school."

21      34.    ABDUL-LATIF said that the conspirators had enough money to go

22 anywhere in the world and had "options" (to choose for target locations). The Source

23 said that they should not lose focus and switch targets. ABDUL-LATIF said that he was

24 not seriously suggesting changing targets. The Source then summarized the progression

25 of ABDUL-LATIF's plan to date: "When you first brought it up, it was [Fort] Lewis, then

26 it flipped to McChord, then it flipped to MEPS, that's why I was saying let's stick, let's

27 stick with this one." ABDUL-LATIF then discussed the advantages of attacking the

28 MEPS. ABDUL-LATIF also repeated that he hoped to inspire other similar attacks.

COMPLAINT
*United States v. Abdul-Latif, et al.* - 18

35.     As the car pulled into the parking lot of the Federal Center South building,
ABDUL-LATIF read aloud the name on the building: "Federal Center South."
ABDUL-LATIF and the Source got out of the Source's car and studied the building.
ABDUL-LATIF commented about observing a security guard and surveillance cameras,
and a long hallway inside the building.  ABDUL-LATIF said that he was not worried
about the guard: "We'll just kill him right away.  . . .  We can kill him first."
ABDUL-LATIF also discussed how the conspirators would approach the MEPS for the
attack, and said that the conspirators could either park and run up to the entrance, or they
could try to drive their car up to the entrance.

36.     ABDUL-LATIF and the Source discussed whether MUJAHIDH was
committed to the attack.  The Source complained that MUJAHIDH did not want to travel
to Washington until July, even though they wanted him there sooner.  ABDUL-LATIF
told the Source not to call MUJAHIDH for a while: "With Walli, just leave him alone for
a couple of days, see if he calls back.  Don't call him or anything."   The Source said that
they needed to know how many people would participate in the attack so he knew how
many weapons to buy.  ABDUL-LATIF told the Source to order enough weapons for
three people.  ABDUL-LATIF told the Source to "put in our order right now" so that they
could get a price estimate for the weapons.  ABDUL-LATIF specifically instructed the
Source to order three rifles, several magazines for each rifle, and ten hand grenades.
ABDUL-LATIF said that, with the grenades, they could "blow up the whole hallway"
that led to the MEPS offices.  ABDUL-LATIF said that he had money set aside with a
third person for the *hajj*, but that he would withdraw some of that money for use in
purchasing the weapons.  ABDUL-LATIF also said that he needed to call the MEPS
again to find out what days the recruits are going to be there.  ABDUL-LATIF
commented that he wanted to "be there on a day when all the recruits are processing.  . . .
I don't want to come there just to kill an old [security] guard."  At the end of the
conversation, ABDUL-LATIF said that the reconnaissance had been productive and that
he and the Source had "learned a lot."

COMPLAINT
*United States v. Abdul-Latif, et al.* - 19

37.     Later on the night of June 8th, MUJAHIDH sent the Source a text message. I have seen this message. It reads: "AsSaalamwailykum im ok. It's still a go on my end."

### ABDUL-LATIF And MUJAHIDH Reaffirm Their Commitment To The Plot

38.     On June 9, 2011, the Source and ABDUL-LATIF had a recorded telephone conversation. I have listened to the recording. During the call, ABDUL-LATIF said that he was worried the conspirators would not have the "element of surprise" when they attacked the MEPS. ABDUL-LATIF had seen a security camera during the reconnaissance and was worried that the guard at the front desk would be watching a live feed from the camera. ABDUL-LATIF was worried that the guard would see the conspirators as they approached the entrance and would be ready for them: "It would kind of be pointless, too, if we rolled up there and we all got shot and killed and we didn't get anybody." The Source said that he did not think that would happen. ABDUL-LATIF said, "That's cool, that's cool. Let's make sure it doesn't happen." ABDUL-LATIF urged the Source to carry out an undercover visit into the building as soon as possible. Later in the conversation, ABDUL-LATIF asked the Source when he could go undercover into the MEPS building. The Source said that he hoped to go the next day.

39.     The Source asked ABDUL-LATIF if he really wanted to go through with the attack: "I want to make sure that you, this is what you're down for. . . . . I'm not going to hold it against you if you say, 'Nah, let's do whatever.' But I just want to make sure that this is what you want, all the way." ABDUL-LATIF said that they needed to "wake the Muslims up" to "defend [their] religion." The Source said, "Do you want to call it off? Or . . . You know, I'm not going to hold it against you." ABDUL-LATIF answered, "Let's work on this, lets make sure it's right. . . . Let's proceed as planned, let's make sure that we do this right." ABDUL-LATIF said that they should only call off the plot if they learned that the FBI was watching them. ABDUL-LATIF confirmed, "I'm ready for this." ABDUL-LATIF further stated that he would call the MEPS the next day to check their schedule: "I don't want to roll up in there just to kill a couple of females and security guards. . . . Everything has to be done with precision, the right time

COMPLAINT
*United States v. Abdul-Latif, et al.* - 20

1 and the right day, the program is on point. That's what I'm looking for."

2     40.     Also during this conversation, the Source told ABDUL-LATIF that he had

3 talked to MUJAHIDH and that MUJAHIDH confirmed that he was willing to travel to

4 Seattle. ABDUL-LATIF and the Source agreed that they needed to get MUJAHIDH to

5 Seattle as soon as possible, and again discussed pooling their money to buy a plane ticket.

6 ABDUL-LATIF said that he was trying to get his hands on his share of the ticket price

7 (roughly seventy dollars).

8     41.     Also on June 9, 2011, the Source exchanged text messages with

9 MUJAHIDH. I have seen the messages. The Source told MUJAHIDH that "everything

10 is in motion" and "you will be up here soon." The Source asked, "Anything on your

11 mind[?]" MUJAHIDH answered, "Everything is fine just waiting to be with you brothers

12 for the sake of Allah . . . . Allah grant us success in w[h]at we go forth to accomplish."

13     <u>Further Planning And Preparation For The MEPS Attack</u>

14     42.     On June 10, 2011, the Source and ABDUL-LATIF had another recorded

15 meeting. I have listened to the recording. During the meeting, the Source pretended to

16 have followed ABDUL-LATIF's instructions to enter the Federal Center South building

17 as an "undercover" to learn its layout. The Source showed ABDUL-LATIF a map he had

18 drawn of the first floor layout. ABDUL-LATIF and the Source had a long conversation

19 about the tactical details of the attack. ABDUL-LATIF explained that he wanted to kill

20 the battalion commander at the MEPS because that would get "attention."

21 ABDUL-LATIF said that he wanted to "run in there man, kill everybody in there, and run

22 back out." ABDUL-LATIF explained that MUJAHIDH's role would be to "watch the

23 front."

24     43.     ABDUL-LATIF and the Source discussed whether they should use flash-

25 bang grenades to stun victims, or fragmentation grenades to maim and kill. With respect

26 to the flash-bangs, ABDUL-LATIF concluded: "Forget that." ABDUL-LATIF asked the

27 Source how much damage he could do by throwing a grenade into the building's

28 cafeteria. The Source said that it would kill and maim a lot of people. ABDUL-LATIF

COMPLAINT
*United States v. Abdul-Latif, et al.* - 21

1 | decided that he wanted fragmentation grenades because they would deter pursuers and

2 | help achieve the "purpose" of the attack (to kill and maim).  ABDUL-LATIF stated that

3 | he wanted ten grenades.  Referring to the map of the building's floor plan,

4 | ABDUL-LATIF explained the details of where and when he would throw grenades

5 | during the attack.  ABDUL-LATIF explained that he wanted another conspirator (a fourth

6 | person) who would serve as the driver and help with the getaway.  The Source stated that

7 | he might know somebody who could be the driver, and ABDUL-LATIF said that he

8 | trusted the Source's judgment.

9 | 44.  ABDUL-LATIF gave the Source a specific weapons order to place with the

10 | Source's "connection": three rifles, two extra magazines for each rifle, five grenades, two

11 | pistols, and three bulletproof vests.  The Source estimated that the total price would be

12 | roughly $2,500.  The Source then asked how the conspirators would get the message out

13 | about the reasons for the attack.  ABDUL-LATIF said that he would print pictures of

14 | soldiers involved in alleged atrocities and leave them on the front desk at the building.

15 | 45.  ABDUL-LATIF and the Source talked about pooling their money to buy a

16 | plane ticket to fly MUJAHIDH to Seattle.  ABDUL-LATIF assured the Source that

17 | MUJAHIDH was committed to the plan, and suggested that he had been talking to

18 | MUJAHIDH about carrying out a terrorist attack even before the Source had become

19 | involved in the plot: "This has been in discussion off and on for a while."

20 | ABDUL-LATIF said that MUJAHIDH would carry out the plan because he was "crazy"

21 | and had no family.

22 | 46.  On or about June 13, 2011, the Source spoke with ABDUL-LATIF over the

23 | telephone.  Again, ABDUL-LATIF expressed his desire to recruit a fourth person to join

24 | them in the attack.  ABDUL-LATIF also stated words to the effect: "Even if it takes an

25 | extra couple of months, we have to do this right. . . . I was jumping the gun on doing this

26 | right now . . . we need to do this right."

27 | //

28 | //

COMPLAINT
*United States v. Abdul-Latif, et al.* - 22

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

ABDUL-LATIF Further Discusses the Attack and Arranges Transportation for MUJAHIDH

47.     ABDUL-LATIF and the Source met again on June 14, 2011, and spent much of the day together. I have listened to the recording of their conversations. ABDUL-LATIF and the Source discussed flying MUJAHIDH from Los Angeles to Seattle. ABDUL-LATIF pulled out his copy of the map of the Federal Center South building (previously provided by the Source) and said that he carried it with him everywhere. Referring to the map, ABDUL-LATIF explained the tactical reasons why he felt that the attackers needed a fourth person.

48.     ABDUL-LATIF also discussed the motives behind his planned attack, specifically referencing the United States Military's presence in the Middle East, among other things. In response to the Source's inquiry about how he planned to get his message out, ABDUL-LATIF suggested that they could make a DVD recording explaining the motives behind the attack, and label the DVD with the title, "The reason we killing your people." ABDUL-LATIF further stated that if they left the DVD behind "in the car," the police would find it.

49.     Later on June 14, 2011, ABDUL-LATIF and the Source called MUJAHIDH to arrange for him to travel to Seattle. This call was recorded and I have listened to the recording. ABDUL-LATIF told MUJAHIDH that he was about to purchase his plane ticket. ABDUL-LATIF asked MUJAHIDH to spell his last name. MUJAHIDH gave his last name as "Domingue Jr." After ABDUL-LATIF and the Source spent some time researching plane tickets on the Internet, MUJAHIDH said that he would rather travel by bus. Using the Internet, ABDUL-LATIF and the Source bought a bus ticket for MUJAHIDH. The bus was scheduled to leave Los Angeles on Monday, June 20, 2011, and arrive in Seattle on Tuesday, June 21st. ABDUL-LATIF gave MUJAHIDH the "pick-up password" for the bus ticket. Initially, ABDUL-LATIF suggested "jihad" as the password. The conspirators laughed, and then ABDUL-LATIF told MUJAHIDH that his password would be "OBL," for "Osama Bin Laden."

COMPLAINT
*United States v. Abdul-Latif, et al.* - 23

| | |
|---|---|
| 1 | <u>ABDUL-LATIF Inspects Weapons And Selects Machineguns For The Attack</u> |
| 2 | 50.    The Source met with ABDUL-LATIF a second time on June 14, 2011.  The |
| 3 | purpose of this meeting was for the Source to show ABDUL-LATIF two types of assault |
| 4 | rifles and a grenade, so that ABDUL-LATIF could choose the weapons he wanted the |
| 5 | conspirators to use during the MEPS attack.  Before the meeting, law enforcement |
| 6 | officers provided the Source with one fragmentation grenade; one Heckler & Koch MP5, |
| 7 | 9 x 19 mm caliber sub-machinegun, with serial number 62-370875; and one Colt M16A2 |
| 8 | Commando, 5.56 mm caliber assault rifle, with serial number A0137282.  Each of these |
| 9 | items was consistent with the types of firearms and grenades that ABDUL-LATIF |
| 10 | previously had instructed the source to obtain.  Due to safety concerns, the firearms and |
| 11 | the grenade were made inoperable before giving them to the Source. |
| 12 | 51.    Special Agent Heidi Wallace of the Bureau of Alcohol, Tobacco, Firearms, |
| 13 | and Explosives has examined both of the above-referenced firearms.  SA Wallace has |
| 14 | extensive training and experience in identifying firearms, determining where they were |
| 15 | manufactured and whether they have traveled in interstate commerce, and in determining |
| 16 | whether firearms are fully-automatic and meet the definition of "machinegun" provided in |
| 17 | Title 18, United States Code, Section 921(a)(23), and Title 26, United States Code, |
| 18 | Section 5845(b).  After examining both firearms, SA Wallace determined that both were |
| 19 | manufactured outside of the State of Washington, and therefore must have traveled to |
| 20 | Washington in interstate or foreign commerce.  SA Wallace also determined that both |
| 21 | firearms were "machineguns" as defined by federal law, because each was designed to |
| 22 | shoot automatically more than one shot, without manual reloading, by a single function of |
| 23 | the trigger. |
| 24 | 52.    The meeting on June 14th took place in the Source's vehicle.  The meeting |
| 25 | was recorded by audio and video, and I have seen and listened to the recording.  The |
| 26 | Source told ABDUL-LATIF that he was going to take him to a secluded place for "show |
| 27 | and tell."  When they arrived, the Source told ABDUL-LATIF that his weapons "contact" |
| 28 | had given him something to show to ABDUL-LATIF so that ABDUL-LATIF would see |

COMPLAINT
*United States v. Abdul-Latif, et al.* - 24

1  that the contact had access to the weapons he wanted.  ABDUL-LATIF asked if they

2  would have to return the items to the contact, and the Source confirmed this.

3  ABDUL-LATIF commented that (during the attack) they should never touch "anything"

4  with their bare hands (to avoid leaving fingerprints).

5      53.    With ABDUL-LATIF sitting in the passenger seat, the Source reached into

6  a duffel bag and pulled out the MP5 sub-machinegun.  The Source told ABDUL-LATIF

7  that the weapon was an MP5 and handed it to ABDUL-LATIF.  ABDUL-LATIF held the

8  machinegun and said, "Tell me about it."  The Source explained that the MP5 fired a

9  9mm round.  ABDUL-LATIF then handed the MP5 to the Source so the Source could

10  show him how to use it.  The Source showed ABDUL-LATIF how to insert and remove a

11  magazine and how to chamber a round.  The Source then pointed to the selector switch

12  that controlled whether the gun would operate in single-fire (semi-automatic) or fully-

13  automatic mode.  The Source asked, "Can you tell which one [setting] is fully-

14  automatic?"  ABDUL-LATIF pointed to the fully-automatic setting.  ABDUL-LATIF

15  asked how many rounds the magazine held, and the Source told him that it held 30

16  rounds.  ABDUL-LATIF asked how much the MP5 cost, and the Source said $300.  The

17  Source handed the MP5 back to ABDUL-LATIF, who again handled the weapon.  On the

18  video, ABDUL-LATIF is shown loading a magazine, pointing the MP5 at the hidden

19  camera, and pulling the trigger.

20      54.    The Source then brought out the M16A2 assault rifle and handed it to

21  ABDUL-LATIF.  The Source identified it as a military-issue "M4," and explained that it

22  was a newer version of the M16.  ABDUL-LATIF held the M16A2 and said, "Okay, tell

23  me about it."  The Source explained that the M16A2 fired a bigger round than the MP5,

24  and that the round would leave a "bigger hole" and penetrate almost "anything."  The

25  Source showed ABDUL-LATIF how to use the M16A2 while ABDUL-LATIF held the

26  weapon.  The Source showed ABDUL-LATIF the selector switch and noted the fully-

27  automatic setting.  ABDUL-LATIF listened as the Source explained the intricacies of

28  using the M16A2, and ABDUL-LATIF said, "We're going to have to work on this a little

COMPLAINT
*United States v. Abdul-Latif, et al.* - 25

1  bit." During the same conversation, ABDUL-LATIF also commented: "We're not doing

2  this tomorrow, so we got time to work with it." ABDUL-LATIF pointed the M16A2 in

3  the direction of the camera and pulled the trigger. The Source told ABDUL-LATIF that

4  the M16A2 would cost $400. ABDUL-LATIF asked the Source which weapon he

5  thought they should use. The Source said that the M16A2 was the better bet. ABDUL-

6  LATIF asked how much the magazines cost. The Source said $50 each.

7      55.    The Source then pulled out the fragmentation grenade and handed it to

8  ABDUL-LATIF. ABDUL-LATIF said, "For real? If you throw it, it will blow up?" The

9  Source showed ABDUL-LATIF how to pull the pin and use the grenade, and ABDUL-

10 LATIF held the grenade in his hand. ABDUL-LATIF asked the Source if he had any

11 pistols. The Source said that he did not have a pistol with him, but said that his weapons

12 supplier told him that pistols were "a dime-a-dozen."

13     56.    ABDUL-LATIF and the Source then discussed whether to use the MP5 or

14 the M16A2. The Source pointed out that the M16A2 round would penetrate a bulletproof

15 vest. ABDUL-LATIF said, "Well, I mean, you know, most people [in the MEPS], they're

16 not wearing vests anyway." The Source noted that the armed security guards would have

17 vests. ABDUL-LATIF said, "We probably want to get what's better." The Source said

18 that would be the M16A2.

19     57.    ABDUL-LATIF then discussed his plans for the attack, including his desire

20 to recruit a fourth attacker. ABDUL-LATIF took out the map of the Federal Center

21 South building layout and, pointing to the map, talked about the attack plan and where

22 they would throw grenades: "[W]e want to throw a grenade right here to prevent anybody

23 from running after us. We go over here, we can, we can either throw a grenade in the

24 cafeteria, or we can throw a grenade in the corner." The Source explained that a grenade

25 would kill or maim anybody within a fifteen yard radius. The Source asked ABDUL-

26 LATIF if he still wanted five grenades. ABDUL-LATIF said, "I want to do what we can

27 afford."

28

COMPLAINT
*United States v. Abdul-Latif, et al.* - 26

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

58.     ABDUL-LATIF instructed the Source to purchase only the assault rifles at this time, and to get the pistols, grenades, and the other items for the attack at a later time. ABDUL-LATIF said that the attackers needed to train with the assault rifles: "Let's get proficient with this [rifle], because this is the most difficult piece of equipment." ABDUL-LATIF explained that they did not need to acquire the pistols and grenades right away, because they did not need to "train" with those items (suggesting that they were easier to use). ABDUL-LATIF said that, once they had the firearms, they could go to Wenatchee to train with them. ABDUL-LATIF explained that he planned to get the $800 from the "brother" (the third party who was holding the money that ABDUL-LATIF had set aside for his religious travel). ABDUL-LATIF mentioned that he had barely ever touched a gun before. During this portion of the conversation, ABDUL-LATIF and the Source continued to handle the M16A2 and practice how to operate it.

59.     Towards the end of the meeting, ABDUL-LATIF specifically instructed the Source to purchase three M16A2's and six magazines, which ABDUL-LATIF expected would cost $1,500. ABDUL-LATIF instructed the Source to place the order for these weapons.

ABDUL-LATIF Provides the Source with Cash to Purchase the Machineguns

60.     On June 16 and 17, 2011, ABDUL-LATIF provided the Source with a total of $800 to pay for the weapons that he and MUJAHIDH intended to use during the attack on the MEPS. On June 16th, ABDUL-LATIF and the Source went to an ATM and ABDUL-LATIF withdrew $80.00, which he gave to the Source. The Source subsequently provided the cash to law enforcement officers.

61.     ABDUL-LATIF provided the balance of the $800 to the Source on June 17, 2011. ABDUL-LATIF had previously told the Source that he would get the money to pay for the weapons by withdrawing funds he had set aside for the *hajj*. ABDUL-LATIF said that another person was holding his *hajj* money for him. On June 17th, ABDUL-LATIF and the Source traveled to that person's place of business to retrieve ABDUL-LATIF's money. I have listened to the recording of their conversation. En route, ABDUL-LATIF

COMPLAINT
*United States v. Abdul-Latif, et al.* - 27

1   complained to the Source that the gun supplier was "sweating" him for the money.

2   ABDUL-LATIF further complained that the gun supplier was causing the Source to call

3   him several times a day to ask for the money.  ABDUL-LATIF said that he was worried

4   about talking about "that thing" (the planned attack) because of the risk of people

5   "tapping our phones" and "putting a pattern together."  ABDUL-LATIF and the Source

6   also discussed their plans to meet MUJAHIDH at the bus station when he arrived on June

7   21, 2011.

8       62.    Once they arrived at the location, the Source waited in ABDUL-LATIF's

9   vehicle while ABDUL-LATIF went to obtain his money.  When ABDUL-LATIF

10   returned to the car, he said to the source: "I just took out my money I was going to use for

11   *hajj* . . . this better be on the up-and-up with this brother [the gun supplier]."  The Source

12   assured ABDUL-LATIF that the supplier would deliver the weapons.  ABDUL-LATIF

13   said they needed to figure out where to store the weapons "ASAP."  ABDUL-LATIF then

14   referred to the planned attack, and said they needed to prepare themselves "physically,

15   mentally, and spiritually."  ABDUL-LATIF told the Source to call him "as soon as you

16   get everything [the weapons]."  After handing over the money, ABDUL-LATIF said, "I

17   gave you seven-twenty, right there."  The Source counted the money out loud.

18       63.    ABDUL-LATIF then told the Source that, in the future, he hoped to have

19   even more money to fund the plot, and talked about buying pistols.  ABDUL-LATIF said

20   that if the attackers run out of rifle ammunition during the attack, they could switch to

21   pistols.  ABDUL-LATIF said, "If we gonna die, we gotta die taking some *kaffirs* with us .

22   . . I'm not trying to run out of bullets."  ABDUL-LATIF again told the Source to call him

23   "right away" when he had the weapons: "We need to hook up right away. . . . Don't go to

24   a store, don't get gas, don't do anything.  Call me."  After this meeting, the Source

25   provided the $720 to law enforcement officers.

26      <u>MUJAHIDH Travels from Los Angeles to Seattle in Furtherance of the Plot</u>

27       64.    On June 20-21, 2011, MUJAHIDH traveled via bus from Los Angeles,

28   California, to Seattle, Washington.  MUJAHIDH arrived in Seattle at approximately

COMPLAINT
*United States v. Abdul-Latif, et al.* - 28

1    1:10 p.m. on June 21st. ABDUL-LATIF and the Source met MUJAHIDH at the bus

2    station upon his arrival in Seattle. Surveillance agents observed ABDUL-LATIF and the

3    Source meeting with MUJAHIDH. The Source then drove the defendants to a restaurant

4    where all three men ate lunch together. I have listened to the recording of their

5    conversation. Among other things, the defendants and the Source discussed where they

6    would store the weapons after they took possession of them. ABDUL-LATIF mentioned

7    the possibility of storing the weapons in a commercial storage unit, and MUJAHIDH

8    suggested renting the unit under his name. After eating lunch, ABDUL-LATIF drove off

9    on his own, leaving MUJAHIDH with the Source.

10          65.    While they were together, the Source and MUJAHIDH discussed various

11   aspects of the planned attack. I have listened to the recordings of their conversations.

12   The Source stated that he planned to do some work on the sound system in his car, "if we

13   survive through this." MUJAHIDH replied that was "not likely to occur . . . we're either

14   gonna get killed or end up locked-up." MUJAHIDH said he would prefer the former.

15   Referring to the overall attack plan, MUJAHIDH asked: "Yeah, so we are going in and

16   killing everybody?" Repeating what ABDUL-LATIF had previously articulated, the

17   Source said that the plan was to kill anybody "in green" or with a military haircut, but not

18   to kill civilians. The Source said that "he [ABDUL-LATIF] chose MEPS" because there

19   should not be many civilians at that location. The Source further stated that he was glad

20   that "he [ABDUL-LATIF] stepped away from Fort Lewis." MUJAHIDH responded,

21   "Why is that? I'd rather do Fort Lewis, man." The Source then explained the tactical

22   problems he anticipated with attacking Fort Lewis.

23          66.    Later in the conversation, the Source commented that "this" (the attack) was

24   his way of getting back at the government. MUJAHIDH responded, "This is my way of

25   getting rid of sins, man. . . . I got so many of 'em. . . . I got a bunch of 'em."

26   MUJAHIDH also told the Source that, before he left Los Angeles, he told a couple of

27   "brothers" that he was going to Seattle on a "jihad." The Source predicted that their

28   attack would make headlines. MUJAHIDH then described the imaginary headline of a

COMPLAINT
*United States v. Abdul-Latif, et al.* - 29

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    newspaper article: "Three Muslim Males Walk Into MEPS Building, Seattle, Washington,

2    And Gun Down Everybody." According to MUJAHIDH, the article would also say that

3    the attackers were "killed on sight . . . police standoff and shooting." MUJAHIDH added:

4    "That's what it's going to come down to, because if they surround the building, the only

5    way out is through them . . . and guns blazing man, guns blazing." MUJAHIDH also

6    made the comment, "We're not walking out of there alive."

7         67.    During the conversation, MUJAHIDH raised the subject of grenades: "So I

8    heard we got a few grenades, too." The Source confirmed that there would be grenades

9    involved in the attack. The Source asked MUJAHIDH if he knew how to use a grenade.

10   MUJAHIDH answered, "Pull the pin and throw." The Source asked MUJAHIDH if he

11   had a problem with using grenades. MUJAHIDH answered, "No." MUJAHIDH

12   commented that they should not use grenades inside the MEPS building, explaining that

13   he thought the building was too small to throw a grenade in without harming themselves.

14   The Source explained that ABDUL-LATIF was, in fact, planning to throw grenades in the

15   building, and he assured MUJAHIDH that the building was big enough for them to throw

16   grenades in without harming themselves. The Source said that they would be able to

17   discuss all of these details later.

18          ABDUL-LATIF and MUJAHIDH Continue to Plan the Attack

19         68.    Later on June 21, 2011, the Source and MUJAHIDH drove to ABDUL-

20   LATIF's residence, arriving at approximately 3:35 p.m. ABDUL-LATIF let them into his

21   apartment. At approximately 4:17 p.m., they began discussing the planned attack. I have

22   listened to the recording of this conversation. ABDUL-LATIF initially explained to

23   MUJAHIDH: "He [the Source] went into the target undercover, and looked around at the

24   place. This [referring to the building layout map] is what we came up with on the bottom

25   floor. I'll let him [the Source] go ahead and explain everything." The Source then

26   described the layout of the building, specifically mentioning the "guard's desk" and the

27   fact that the guards are armed with pistols.

28

COMPLAINT
*United States v. Abdul-Latif, et al.* - 30

69.     The Source said that there were "only two weapons that I saw," referring to the guards. MUJAHIDH replied, "That we know of." ABDUL-LATIF then explained: "The key thing to remember here is, is we are not targeting anybody innocent – that means old people, women out of uniform, any children. Anything. Just people who wear the green for the *kaffir* Army, that's who we're going after." ABDUL-LATIF further stated, "We'll basically be able to tell who's there for MEPS." ABDUL-LATIF then explained that the function of the MEPS is to process applicants for the United Stats military.

70.     ABDUL-LATIF referred to the map again and explained where the conspirators would go during the attack. ABDUL-LATIF said he was concerned that, pursuant to his plan, the "door to the cafeteria is not guarded. . . . There could be anybody that comes out of there with anything. We don't know." MUJAHIDH suggested: "Why don't we all just go into there with guns blazing, and just lay everybody down. They're all *kaffirs* anyway. Just lay everybody down. And we all just make our way around here (the hallway) together. And whoever gets laid down, gets laid down." ABDUL-LATIF stated that most of the people going through the MEPS would be sent to Afghanistan and Iraq: "They are being sent to the front lines to kill our brothers and sisters over there." ABDUL-LATIF further stated that he was "not comfortable with killing children or anything like that." In response, MUJAHIDH assured ABDUL-LATIF that there would not be any children in the building during the attack. MUJAHIDH reiterated: "Seriously though, I think we should go in there, hit the two guards, lay everybody down on the way, go on around here (the hallway). You know what I'm saying?"

71.     In discussing the possibility that they could escape after the attack, the Source commented that the police are likely to surround the building as the attack is in progress. ABDUL-LATIF replied, "So, why don't we try to get the RPG's, then, for that purpose?" ABDUL-LATIF asked the Source to check how long it would take for his "contact" to obtain RPG's. The Source agreed to do so, and estimated that RPG's would

COMPLAINT
*United States v. Abdul-Latif, et al.* - 31

1  cost approximately $1,000 each, and would take one month for his contact to acquire.

2  ABDUL-LATIF then stated, "We're all gonna look like fools if all we have is two clips

3  apiece and we run out. . ." ABDUL-LATIF said he wanted to save up their money and

4  buy as much ammunition as possible, so that they can fight back against the police on the

5  perimeter. ABDUL-LATIF then explained:

6       Now we got the guns, we don't have to worry about that, that's done. And,
        we can spend another three or four hundred dollars on clips. So, if we get
7       another, say, at least three grand, then we can buy two RPG's, and buy more
        clips, buy a few grenades, you know what I'm saying? And then get the
8       jackets [bulletproof vests], you know what I'm saying? That should hold it
        down. 'Cause if I'm going down, I wanna last as long as I can, and take as
9       many of them as I can. That's all I'm saying. I don't wanna be a fool and
        just – oh, I'm out [of ammunition] . . . We need as much as we can get,
10      especially if we're going down.

11  ABDUL-LATIF also emphasized, "We're not only trying to kill people, we're trying to

12  send a message. We're trying to get something that's gonna be on CNN and all over the

13  world. . . . That's what we want."

14       72.   ABDUL-LATIF then discussed various perceived atrocities committed by

15  the United States Military in the Middle East, and he played related video clips over his

16  computer for MUJAHIDH and the Source. ABDUL-LATIF commented that "nobody is

17  dealing with it," and MUJAHIDH replied, "We're gonna deal with it, alright." In further

18  discussing the attack on the MEPS, MUJAHIDH stated, "We go into the MEPS, and like

19  I said, we might as well lay everybody down, bro. Everybody. Straight-up, you know

20  what I'm saying? . . . Lay everybody down on the first floor, then go upstairs and lay

21  everybody down on the second floor." Later in the conversation, MUJAHIDH reiterated:

22  "At the MEPS, ain't gonna be no innocent women and children, bro. That's why I'm

23  saying we go in there and lay everybody down, man. Everybody in that building is

24  connected with the military." In response to ABDUL-LATIF and the Source discussing

25  the possibility of escaping by running out of the building, MUJAHIDH asked, "With

26  M16's in our hands?"

27       73.   ABDUL-LATIF stated, "If we are staying at this place [targeting the

28  MEPS], we can just get grenades, man. Remember how I was telling you about how we

COMPLAINT
*United States v. Abdul-Latif, et al.* - 32

1    could throw the grenades around the building?" Referring to the building map, ABDUL-

2    LATIF explained to MUJAHIDH: "We're gonna hit the commander. . . . The thing is,

3    on Mondays and Tuesdays, those are the main days that they do full processing for

4    soldiers getting ready to go to boot camp. So if we do something like this, it's gonna

5    have to be on a Monday or a Tuesday. No other day than that. We're not going there to

6    kill the security guard. There's no sense in that." MUJAHIDH replied, "But if he got to

7    go, he got to go," referring to killing the security guard. MUJAHIDH later described

8    what he planned to do during the attack, referring to the map: "This is what I'm gonna do:

9    I'm gonna post guard. I'm gonna come in, pop-pop the security guard. Run into the

10   cafeteria, lay everybody down in there. Pop-pop-pop-pop. 'Get on the ground, get on the

11   ground, get on the ground!' And these offices right here, pop-pop-pop-pop." ABDUL-

12   LATIF suggested that MUJAHIDH should take a different route inside the building, and

13   MUJAHIDH agreed that he could first go to the offices and then the cafeteria.

14       74.    ABDUL-LATIF then discussed what each man's role would be during the

15   attack, and MUJAHIDH replied, "My thing is, I want more of the action!" ABDUL-

16   LATIF explained that, because of the barriers in the parking lot, they would not be able to

17   return to their truck after they entered the MEPS. ABDUL-LATIF further explained that

18   they would need to bring "everything inside with us," and said that he had a "big green

19   bag" to carry things in.

20       75.    Referring to the map, ABDUL-LATIF discussed in detail where the

21   attackers would throw the grenades: "We come up in here . . . we throw the grenade in

22   there. . . . Move up, throw the grenade in here. . . . Have one of us wait on the corner . .

23   . the other two keep going. . . . When you get here, we drop the grenade here. You get

24   halfway down the hallway, we drop the grenade down here. We can throw one in the

25   bathroom, too. . ." MUJAHIDH added, "[W]hen you throw the grenade, you want to

26   drop flat to the ground." The Source disagreed, and said that they needed to train together

27   on how to throw grenades.

28

COMPLAINT
*United States v. Abdul-Latif, et al.* - 33

76.     During this conversation, the Source expressly asked if ABDUL-LATIF and MUJAHIDH wanted to back out of the plot.  The Source explained that he would not hold it against them or think lesser of them if they opted out of the attack.  ABDUL-LATIF answered, "We're not doing this for you."  MUJAHIDH said, "I'm in it, bro." ABDUL-LATIF further replied, "I gave you all my money for this thing."  MUJAHIDH emphasized that ABDUL-LATIF had spent his *hajj* money to fund the plot.

77.     Also during this conversation, ABDUL-LATIF instructed the others about what they should do if apprehended by law enforcement: "If any of us gets caught, and we survive . . . don't ever say anything to the police. . . . [W]e have to promise, if any of us gets caught or thrown in jail for any reason before this happens, if they offer you a deal to talk, don't talk."

78.     ABDUL-LATIF then revisited the idea of attacking Fort Lewis.  In response, the Source said that their current target (the MEPS) was a good one and they should stick with their plan.  The discussion then moved to other topics, including ABDUL-LATIF complaining again about the American military presence in the Middle East.  ABDUL-LATIF also discussed historical figures who have sacrificed for a cause, and then specifically compared the conspirators' intended "sacrifice" during the MEPS attack to the actions of Nidal Hassan (the Army officer charged in the attack that killed 13 people at Fort Hood).

79.     As the meeting ended, the Source told ABDUL-LATIF and MUJAHIDH that he expected to be able to pick-up the weapons ABDUL-LATIF had ordered at approximately 6:00 p.m. the next day, on June 22, 2011.

<u>The Delivery of the Weapons and the Arrests of ABDUL-LATIF and MUJAHIDH</u>

80.     On June 22, 2011, at approximately 3:00 p.m., the Source spoke to ABDUL-LATIF over the telephone.  They agreed to meet later that night at 6:00 p.m., along with MUJAHIDH, to acquire the weapons that ABDUL-LATIF had ordered.  I have listed to the recording of the conversation.  During the conversation, ABDUL-LATIF stated that he may store the weapons at one of his clients' businesses for a few

COMPLAINT
*United States v. Abdul-Latif, et al.* - 34

1  days, until he could arrange to rent a commercial storage location.

2      81.    At approximately 6:00 p.m. on June 22nd, the Source took ABDUL-LATIF

3  and MUJAHIDH to a warehouse garage in Seattle.  The Source previously told the

4  defendants that the machineguns ABDUL-LATIF had ordered would be at that location.

5  Before the defendants and the Source arrived at the garage, law enforcement officers had

6  placed three Colt M16A1 assault rifles (which had been rendered inoperable) in the

7  garage, along with six unloaded magazines.  The garage was equipped with hidden audio

8  and video recorders.

9      82.    Prior to delivering the M16A1 assault rifles to the garage, FBI agents

10  arranged for ATF SA Heidi Wallace (referenced above) to inspect the firearms.  After

11  examining the firearms, SA Wallace confirmed that the firearms consisted of a

12  Colt M16A1, 5.56 mm caliber assault rifle, with serial number 9463259; a Colt M16A1,

13  5.56 mm caliber assault rifle, with serial number 9574856; and a Colt M16A1, 5.56 mm

14  caliber assault rifle, with serial number 9396093.  SA Wallace also determined that each

15  of the firearms were manufactured outside of Washington State, and therefore must have

16  traveled to Washington in interstate or foreign commerce.  SA Wallace further

17  determined that each of the firearms were "machineguns" as defined by federal law,

18  because each was designed to shoot automatically more than one shot, without manual

19  reloading, by a single function of the trigger.

20      83.    Shortly before 6:00 p.m. on June 22nd, ABDUL-LATIF and MUJAHIDH

21  traveled to the garage in the Source's vehicle.  Their conversation was recorded, and I

22  have listened to the recording.  During the drive, ABDUL-LATIF confirmed with the

23  Source the price the "contact" was going to charge them for grenades and RPG's.

24  ABDUL-LATIF also discussed the planned attack: "I'm kind of wishy-washy about

25  whether . . . I'm thinking, do we want to last for a while?  Or do we want to go in there

26  and just kill people and just run out and commit suicide?  Or do we want to hold – control

27  the building . . .  control the building, hold it down for a while until we're out of

28  artillery?"  Moments later, ABDUL-LATIF stated: "If we can get control of the building

COMPLAINT
*United States v. Abdul-Latif, et al.* - 35

1   and we can hold it for a while, then we'll get the local news down there, the media down

2   there, you know what I'm saying?"

3        84.    The Source's vehicle arrived at the garage at approximately 6:05 p.m.

4   ABDUL-LATIF, MUJAHIDH, and the Source entered the garage together.  This meeting

5   was captured on video and audio recordings.  I have listened to the recordings and have

6   discussed the video footage with other agents who have viewed it.  Shortly after entering

7   the garage, the Source opened a duffle bag containing the three M16A1 firearms.

8   ABDUL-LATIF and MUJAHIDH looked in the bag and then they each took possession

9   of an M16A1.  The video depicts both ABDUL-LATIF and MUJAHIDH holding the

10  M16A1's for several minutes.  MUJAHIDH is depicted aiming the weapon – both

11  standing and kneeling down – and pulling the trigger on multiple occasions.  ABDUL-

12  LATIF commented that, "This is an automatic," referring to the M16A1.  The Source

13  then showed ABDUL-LATIF the fully automatic setting switch on the M16A1, and

14  reminded him how to load the magazine into the firearm, how to hold the gun when

15  firing, and how to correct jams.  The Source also explained that each of the magazines

16  held 30 rounds of ammunition.  During this portion of the conversation, MUJAHIDH was

17  standing only a few feet away from ABDUL-LATIF.  During the meeting, the video

18  depicts ABDUL-LATIF aiming the weapon and pulling the trigger on multiple occasions.

19  After several minutes, the Source gathered the weapons and placed them back into the

20  bag.  The Source then asked ABDUL-LATIF, "So, where are we gonna take this [the

21  bag]?  Where is the shop you were talking about?"  ABDUL-LATIF answered, "In

22  Burien.  First and Burien."  Moments later, FBI agents made entry into the garage and

23  placed both ABDUL-LATIF and MUJAHIDH under arrest.

24       <u>The Post-Arrest Statements Made by ABDUL-LATIF and MUJAHIDH</u>

25       85.    After his arrest, MUJAHIDH was taken to a police interview room.  The

26  interview was video and audio recorded.  MUJAHIDH spoke with agents for

27  approximately one hour, and then was read his *Miranda* rights.  MUJAHIDH waived

28  those rights orally and by signing a *Miranda* waiver form, and continued speaking with

COMPLAINT
*United States v. Abdul-Latif, et al.* - 36

1  agents.  After waiving his *Miranda* rights, MUJAHIDH admitted that he was planning on

2  carrying out an attack at the MEPS for the purpose of killing United States military

3  personnel in order to prevent them from going to Islamic lands and killing Muslims.

4  MUJAHIDH further admitted that he had traveled to Seattle from Los Angeles for that

5  purpose.  MUJAHIDH explained that, during the attack, he was going to guard the front

6  door of the building and would use an M16 assault rifle.  When asked what the grenades

7  were going to be used for, MUJAHIDH answered that the grenades were for the same

8  purpose as the assault rifles.  MUJAHIDH further stated that his goal was to die as a

9  martyr.  During the course of the interview, MUJAHIDH answered many questions and

10  refused to answer others.  Eventually, MUJAHIDH terminated the interview.  As he was

11  being transported to the Federal Detention Center in Sea-Tac, Washington, MUJAHIDH

12  asked agents how long they had known about the planned attack, specifically asking, "A

13  couple months?"  This question was not in response to any inquiry by the agents.

14  MUJAHIDH's comments suggest that he and ABDUL-LATIF had been discussing the

15  attack for at least two months.  This is consistent with statements ABDUL-LATIF has

16  made to the Source, as described in paragraph 45 above.

17         86.     ABDUL-LATIF made no pertinent post-arrest statements.

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

COMPLAINT
*United States v. Abdul-Latif, et al.* - 37

**D.      Conclusion**

87.      Based on the foregoing, I believe there is probable cause to believe that the defendants, ABU KHALID ABDUL-LATIF, a/k/a JOSEPH ANTHONY DAVIS, and WALLI MUJAHIDH, a/k/a FREDERICK DOMINGUE, JR., committed the following offenses: Conspiracy to Murder Officers and Employees of the United States, in violation of Title 18, United States Code, Sections 1114(1) and 1117; Conspiracy to Use Weapons of Mass Destruction, in violation of Title 18, United States Code, Sections 2332a(a)(2)(C) and 2332a(a)(3); Possession of Firearms (Machineguns) in Furtherance of Crimes of Violence, in violation of Title 18, United States Code, Sections 924(c)(1)(A) and 924(c)(1)(B)(ii); and Unlawful Possession of Firearms, in violation of Title 18, United States Code, Section 922(g)(1).

ALBERT C. KELLY III, Special Agent
Federal Bureau of Investigation

Based on the Complaint and Affidavit sworn to before me, and subscribed in my presence, on June 23, 2011, the Court hereby finds that there is probable cause to believe the defendants committed the offenses set forth in the Complaint.

MARY ALICE THEILER
United States Magistrate Judge

COMPLAINT
*United States v. Abdul-Latif, et al.* - 38